[No. B046265. Second Dist., Div. Two. Apr. 1, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH VINCENT DOSS, Defendant and Appellant.

1586

**COUNSEL**

Rusell Iungerich and Gary E. Gibbs for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Linda C. Johnson and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MANELLA, J.**\*—Defendant Joseph Doss, a pharmacist, was convicted following a jury trial of four counts of possession for sale of four controlled substances. In counts 1, 2, and 3, he was found guilty of possessing for sale glutethimide (Doriden), secobarbital/amobarbital (Tuinal), and amphetamine (Biphetamine), in violation of Health and Safety Code section 11378. In count 4, he was found guilty of possessing for sale hydromorphone (Dilaudid) in violation of Health and Safety Code section 11351. He was placed on probation for a period of four years, on condition, inter alia, that he spend nine months in county jail and pay a $5,000 fine.

On appeal, defendant challenges both the legal and factual sufficiency of the evidence, the admissibility of the agent's expert testimony, and the trial court's denial of his motion to suppress. We affirm.

### Summary of Evidence

■ The evidence, taken in the light most favorable to the judgment (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]), established that over a 15-month period, defendant, the owner of Medical Memorial Pharmacy, ordered and took possession of large quantities of certain controlled substances in high dosages. The drugs were of a type rarely prescribed by physicians but in high demand among the illegal street trade. At the end of the 15-month period, an audit of defendant's pharmacy revealed that none of the ordered drugs were in stock; that there were no prescription forms to account for the legal distribution of any of the drugs as required by law; that defendant had no inventory of drugs in stock as required by the Drug Enforcement Administration (DEA); and that there had been no reported burglaries of defendant's pharmacy to account for the disappearance of the drugs.

Bureau of Narcotics Enforcement Agent Paul King, after being found qualified as an expert, testified to the effects of the four drugs, to their popularity as street drugs, and to the rarity with which they were currently prescribed by physicians. He opined that if a pharmacy had ordered and taken possession of the quantities of glutethimide (Doriden) and Dilaudid ordered by defendant over the period in question, and at the end of that period none of the drugs were in stock, no prescriptions existed to show their proper distribution, no packing or shipping invoices existed, no DEA-required inventory had been prepared, and there were no known thefts, the drugs had been possessed with the intent to engage in illegal street sales.

---

\*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.

On appeal, defendant alleges the evidence was legally insufficient to warrant its submission to the jury and factually insufficient to sustain his convictions. He further challenges the qualifications of Agent King as an expert and alleges that his opinion testimony was improperly admitted. Finally, he challenges the trial court's denial of his motion to suppress evidence obtained by the State Board of Pharmacy inspector during his audit of defendant's pharmacy records.

### Legal Sufficiency of the Evidence

■ Defendant alleges that the trial judge erred in allowing the case to go to the jury. Specifically, he contends that in the absence of evidence that he illegally possessed drugs outside pharmacy premises, he was immunized from prosecution by Business and Professions Code section 4230. As a matter of first impression, this case squarely presents the issue whether a pharmacist is immune from prosecution for illegal possession of controlled substances, absent evidence he removed the drugs from pharmacy premises.

Counts 1, 2, and 3 of the information charged defendant with possession for sale of Doriden, Tuinal, and Biphetamine, in violation of Health and Safety Code section 11378. That section provides in relevant part:

"*Except as otherwise provided in Article 7 (commencing with Section 4211) of Chapter 9 of Division 2 of the Business and Professions Code,* every person who possesses for sale any controlled substance . . . . shall be punished by imprisonment in the state prison." (Italics supplied.) The Business and Professions Code sections referred to above include section 4230, which provides:

"No person shall have in possession any controlled substance, except that furnished to such person upon the prescription of a physician, dentist, podiatrist, or veterinarian. *The provisions of this section do not apply to the possession of any controlled substance by* a manufacturer or wholesaler or *a pharmacy* or physician or podiatrist or dentist or veterinarian, *when in stock in containers correctly labeled with the name and address of the supplier or producer.*" (Italics supplied.)[1] Defendant contended below, and maintains on appeal, that Business and Professions Code section 4230 immunized him from prosecution because he was a pharmacist and there was no evidence he withdrew the missing drugs from the pharmacy premises.

---

[1]Count 4, charging defendant with possession for sale of Dilaudid, was brought under Health and Safety Code section 11351, which contains no exemption under Business and Professions Code section 4230. At trial, however, both the parties and the court assumed that the exemption applied. Accordingly, the jury was instructed that "[a] pharmacist may lawfully possess any controlled substance within a pharmacy when the controlled substance is in stock in containers correctly labeled with the name and address of the supplier or producer."

The argument fails. The obvious purpose of Business and Professions Code section 4230 is to authorize the possession for sale of certain controlled substances by licensed pharmacists, on pharmacy premises, to those holding valid prescriptions. It does not confer blanket immunity on a pharmacist to deal drugs illegally from behind the counter or to possess them with that intent. Significantly, section 4230 authorizes the possession of certain controlled substances by "a pharmacy," rather than an individual pharmacist, and does so only on condition that the drugs be "in stock" in correctly labeled containers. (See *People* v. *Kessler* (1967) 250 Cal.App.2d 642, 646-647 [58 Cal.Rptr. 766].) Clearly, a pharmacist who purchases controlled substances with the intention of distributing them to persons not holding valid prescriptions is not conducting the ordinary business of the pharmacy, and the drugs are not "in stock" for the pharmacy's legal business.

Courts have consistently rejected claims by health care professionals of absolute immunity from prosecution for illegal possession and distribution of controlled substances. In *United States* v. *Moore* (1975) 423 U.S. 122 [46 L.Ed.2d 333, 96 S.Ct. 335], the Supreme Court held that a physician registered under the Controlled Substances Act could be prosecuted for dispensing controlled substances outside the usual course of his professional practice. The court found no blanket exemption shielded physicians from prosecution for unauthorized distribution of controlled substances. Similarly, in *People* v. *Marschalk* (1962) 206 Cal.App.2d 346 [23 Cal.Rptr. 743], the court affirmed a nurse's conviction for illegal possession of a narcotic, rejecting her claim that she was privileged to possess the drug. Noting first that any privilege to possess a narcotic must be affirmatively shown by the defendant, the court continued:

"It is true that the general statutory plan is to grant certain privileges to physicians, pharmacists and others engaged in the care of the sick, in respect to the use of otherwise unlawful drugs. These privileges, however, are not absolute. (*People* v. *Nunn* (46 Cal.2d 460, 467 [296 P.2d 813].) The statutes and cases carefully circumscribe the possession and use of narcotics by such privileged persons to the purpose of the privilege. . . . When the handling of the narcotic is for a purpose not connected with the privilege, the possession is unlawful. (*People* v. *Ard*, 25 Cal.App.2d 630 [78 P.2d 254]; *People* v. *Wallace*, 109 Cal.App.2d 676 [241 P.2d 264]; *People* v. *Silver*, 176 Cal.App.2d 377 [1 Cal.Rptr. 179].)" (206 Cal.App.2d at p. 350.) Pharmacists have fared no better. In *People* v. *Kessler, supra,* 250 Cal.App.2d at page 645, the court upheld a conviction of a licensed wholesale pharmacist for illegal possession for sale of dangerous drugs, where the drugs were not in stock in correctly labeled containers. And in *People* v. *Silver* (1959) 176 Cal.App.2d 377 [1 Cal.Rptr. 179], the court rejected a claim by a pharmacist

that he could not be guilty of the unlawful possession of narcotics which he had lawfully acquired. In so doing, the court expressly approved an instruction that " '[a] person in lawful possession of one of the listed narcotics becomes a violator of the statute if the possession ceases to be lawful.' " (*Id.* at p. 380.) Although both *Silver* and *Kessler* involved a pharmacist's possession of drugs outside pharmacy premises, the distinction is immaterial, for the privilege of a pharmacist to possess controlled substances extends no further than the activities incidental to the lawful distribution of such substances. To hold otherwise would be to immunize from prosecution a pharmacist who blatantly advertised, "Controlled Substances Sold Here To The Highest Bidder—No Prescriptions Required." Simply put, a pharmacy is not a sanctuary from which controlled substances may be illegally distributed or possessed for that purpose.[2]

Defendant does not contend the trial court improperly instructed the jury on the meaning of Business and Professions Code section 4230, but only that under section 4230 he could not have been found guilty of the charged offenses. Because we hold that section does not confer blanket immunity on a pharmacist to possess controlled substances for any purpose on pharmacy premises, the case was properly submitted to the jury.

*Factual Sufficiency of the Evidence*

■ Defendant argues that apart from the exemption provided by Business and Professions Code section 4230, the evidence was insufficient to permit the inference that he possessed the controlled substances listed in counts 1 through 4 for the purpose of illegally distributing them. Taken in the light most favorable to the judgment, however, the evidence was compelling.

The prosecution's evidence established that from January 1987 through April 18, 1988, defendant's pharmacy ordered from one pharmaceutical wholesaler 4,000 tablets of glutethimide (Doriden) in the highest dosage

---

[2]In so holding, we note that our decision is consistent with federal law in this state and with other state authorities. See, e.g., *United States* v. *Goldfine* (9th Cir. 1976) 538 F.2d 815, 819 (pharmacists properly convicted of illegal possession of controlled substances under 21 U.S.C. § 841(a)(1) for activities conducted on pharmacy premises); *Dover* v. *State* (Wyo. 1983) 664 P.2d 536 (pharmacist who dispensed drug to himself on pharmacy premises for purpose of illegal distribution properly convicted of illegal possession); *Chesteen* v. *State* (Ala.Crim.App. 1978) 365 So.2d 102 (defendant's status as pharmacist did not shield him from prosecution under state's Controlled Substances Act for conduct on pharmacy premises.)

available.[3] At least three of the proof of delivery slips appeared to bear defendant's signature. During this same period, defendant's pharmacy ordered from another wholesaler 2,500 Biphetamine, 1,200 Dilaudid, 2,800 Tuinal, and an additional 11,500 glutethimide.[4] These orders too were for the strongest dosages available. A number of invoices and driver manifests showing delivery of the four drugs to defendant's pharmacy appeared to bear the signature "J. Doss" as the person accepting the shipments. In ordering schedule II drugs, a pharmacy must complete a DEA form 222. Twelve of the forms introduced in connection with the drug purchases were signed in the name of defendant Joseph Doss.

On April 18, 1988, following a report from a drug wholesaler that defendant's pharmacy had ordered an excessive amount of glutethimide, California State Board of Pharmacy Inspector Martin Levine conducted an audit of Medical Memorial Pharmacy. Inspector Levine's audit revealed that the pharmacy had no purchase records for glutethimide, Biphetamine, Dilaudid, or Tuinal. Although the law requires that prescriptions be kept on pharmacy premises for a period of three years, Inspector Levine could find no prescriptions for the lawful distribution of any of the four drugs during the period January 1987 through April 18, 1988. When Inspector Levine asked defendant for the Drug Enforcement Administration-required inventory for the period in question, defendant advised that none had been performed.[5] An audit of the pharmacy's inventory revealed no glutethimide, Biphetamine, Dilaudid, or Tuinal in stock. Defendant declined to provide an explanation for the missing drugs, but said that he was unaware of any thefts from the pharmacy during the 15-month period.[6]

---

[3]Glutethimide, also known as Doriden, is a schedule II controlled substance, formerly prescribed for insomnia, but rarely prescribed today because of its abuse potential. When abused, it produces a heroin-like effect.

[4]Biphetamine is an infrequently prescribed stimulant, also known as "speed," and used illegally as an "upper," sometimes in conjunction with a "downer" or heroin. Dilaudid, also known as "street heroin," is a highly addictive and powerful painkiller, occasionally prescribed for terminally ill cancer patients. Because of its high demand in illegal markets, many pharmacies will not carry Dilaudid except on a by-order basis. Tuinal tablets, also known as "black beauties," are barbiturates, used to produce a euphoric effect or to counteract the effects of cocaine.

[5]The DEA requires pharmacies to make an inventory of controlled substances every two years and to keep it on file for inspection for three years.

[6]It appears undisputed that defendant was an experienced pharmacist, aware of the laws governing his business. He had owned Medical Memorial Pharmacy for nine years, the pharmacy had been inspected before, and the records had been reviewed. In 1987, defendant had been advised by a Pharmacy Board inspector of the high level of abuse of Dilaudid and Doriden (glutethimide), and had been warned that a "red light should go on" if he saw prescriptions for these two drugs. The April 1988 audit by Inspector Levine revealed that defendant did keep prescriptions for schedule II drugs other than Doriden, Biphetamine,

Agent Paul King of the California Department of Justice, Bureau of Narcotic Enforcement, testified as an expert witness. His credentials included 18 years as a law enforcement officer and 600 hours of training in the sale, possession and manufacturing of scheduled pharmaceutical drugs. At the time of trial, Agent King was an instructor at the Department of Justice Academy in "diversion investigations," the diverting of pharmaceutical drugs from legal to illegal sources. He had qualified as an expert witness six times concerning the possession, manufacture, and possession for sale of scheduled pharmaceuticals.

Agent King testified to the effects of the four drugs in question, to the relative infrequency of their use by physicians, and to their popularity and demand as street drugs for illegal use. Agent King opined that if a licensed pharmacy ordered 15,500 glutethimide and 1,200 Dilaudid between January 1987 and April 1988, and thereafter had none of the drugs in stock, had no DEA inventory showing the drugs in stock, had no prescriptions showing the lawful dispensing of the drugs, had no packing or shipping invoices, and there were no known thefts, the drugs were possessed for illegal sales on the street. Agent King's additional consideration of the remaining drugs, Tuinal and Biphetamine, strengthened his opinion. Finally, Agent King opined that it would be impossible for a pharmacist "not [to] have any paper work and to have a zero inventory for all four of those drugs."

The jury was entitled to conclude from the evidence that defendant possessed the four controlled substances for the purpose of selling them outside the legitimate practice of his pharmaceutical business. It was undisputed that the pharmacy ordered and received the drugs and that defendant took possession of some of them. It was equally undisputed that all of the drugs disappeared from the pharmacy without a single record to account for their lawful distribution and without any report of a theft or burglary. Finally, it was undisputed that the drugs were of a kind rarely prescribed by physicians but in demand on the street, and that defendant was aware of such demand. The jury had more than sufficient evidence to convict defendant on all four counts.

As noted above, defendant was not deprived of the jury's consideration of the exemption contained in Business and Professions Code section 4230; it was specifically instructed on the language of that section, and further

---

Dilaudid, and Tuinal. The audit further revealed that in 1986, when defendant had filled prescriptions for Doriden, a number of the prescriptions contained handwritten notations indicating that the patient had been questioned, or the physician called, or the physician's License Verification Board contacted.

instructed that "[a] pharmacist may lawfully sell any controlled substance within a pharmacy to individuals possessing valid prescriptions, . . . ."[7] Just as the jury was entitled to consider the exemption, it was entitled to find, on the evidence before it, that the exemption did not apply, and that defendant had purchased and possessed the drugs for the purpose of selling them illegally.[8]

## Agent King's Expert Testimony

Defendant challenges the admissibility of Agent King's expert testimony on the grounds that he was not qualified as an expert, that his expert opinion that defendant possessed the drugs for sale was improper, and that his testimony concerning the "street value" of the controlled substances was unduly prejudicial and should have been excluded under Evidence Code section 352.

■ With respect to Agent King's qualifications as an expert, we note first that a trial court has discretion to determine whether a proposed witness is qualified to testify as an expert under Evidence Code section 720, and that the court's decision will not be disturbed absent as abuse of discretion. (*Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701 [106 Cal.Rptr. 1, 505 P.2d 193].) ■ As noted above, Agent King's qualifications included extensive experience in law enforcement, including serving as an instructor in the diversion of pharmaceutical drugs and testifying previously as an expert. He had particular expertise in the area of illegal distribution of pharmaceuticals, having served as a lead agent in nearly two dozen cases involving doctors and pharmacists. He had participated in both state and federal investigations, and had received field training from the Board of Pharmacy, the Board of Medical Quality Assurance, the DEA, and two district attorneys' offices. He was familiar with the effects of the drugs in question, their classification under state and federal law, their legitimate and illegitimate use, and their current demand on the street. The

---

[7]The court's instruction arguably favored defendant by referring to the exemption for a "pharmacist" rather than a "pharmacy," and by assuming its applicability to Health and Safety Code section 11351 (count 4). See footnote 1, *ante*.

[8]*People* v. *Lieber* (1956) 146 Cal.App.2d Supp. 910 [304 P.2d 869], relied upon by the defense, is inapposite. There, the superior court reversed a defendant's conviction for dispensing Demerol without maintaining proper records, where the trial court had instructed the jury that a mere shortage in the narcotics accounts of the corporation of which the defendant was an officer constituted prima facie evidence of his guilt. Significantly, Lieber was charged not with possession, but with dispensing, and there was no evidence that he had done so. Moreover, in *Lieber* the defendant had ordered 42 vials of Demerol, had records of having dispensed 26, and had 8 vials on hand, leaving a shortage of only 9 vials. Here, in contrast, defendant's orders of the four drugs in question exceeded 20,000 tablets, not a single prescription was produced, and not a single tablet was found in stock.

trial court made a specific finding that Agent King was an expert in the area and that his opinion would be helpful to the jury. Given Agent King's obvious qualifications, there was no abuse of discretion.

■ Nor did the trial court err in allowing Agent King to opine that under the facts of the hypothetical posed to him, the drugs were possessed for the purpose of illegal street sales. It is neither unusual nor impermissible for an expert to testify to an ultimate issue, and such opinions are expressly contemplated by Evidence Code section 805. (See *Paez* v. *Alcoholic Beverage Control Appeals Bd.* (1990) 222 Cal.App.3d 1025, 1026-1027 [272 Cal.Rptr. 272].) The court carefully crafted its ruling to minimize any undue prejudice, by precluding the prosecution from including in its hypothetical defendant's refusal to account for the disappearance of the drugs, or from inquiring as to their actual street value. Defense counsel remained free to challenge the basis of Agent King's testimony or to call an expert with a contrary opinion.

Moreover, even absent Agent King's opinion as to the purpose of defendant's possession of the drugs, there was considerable evidence to support the jury's inference that he possessed them for the purpose of illegal distribution. The evidence summarized above, coupled with the undisputed fact that such controlled substances were in high demand for illegal street sales, gave the jury ample basis for concluding defendant's possession of the drugs was for the purpose of dispensing them outside the lawful practice of his pharmaceutical business. (Cf. *People* v. *Hunt* (1971) 4 Cal.3d 231 [93 Cal.Rptr. 197, 481 P.2d 205] [defendant's possession of four vials of a restricted drug, prescribed to him by a physician, and amounting to no more than a two-week supply, could not sustain conviction of possession for sale, notwithstanding officer's opinion to the contrary].)

■ Finally, we find no abuse of discretion in the trial court's refusal to exclude Agent King's testimony on grounds of undue prejudice under Evidence Code section 352. Agent King did not testify to the actual street value of the drugs, but only to the demand for them, and to the relatively high demand for Dilaudid and glutethimide. Defendant's own knowledge of the high street demand for these drugs could not seriously be questioned; not only was he an experienced pharmacist, but he had been expressly warned of the high level of abuse of Dilaudid and glutethimide during a 1987 visit by a Pharmacy Board inspector. Given the considerable evidence showing defendant's receipt of the drugs and their unauthorized disappearance from his pharmacy, Agent King's testimony that the drugs were in high demand on the street was directly probative on the issue of intent, and did not invite

undue speculation.[9] Again, as the trial court noted, the defense was free to cross-examine Agent King on the basis for his opinion and to present evidence to refute it.

## Denial of Defendant's Motion to Suppress

■ Defendant contends the trial court improperly refused to suppress evidence gained from California State Board of Pharmacy Inspector Martin Levine's audit of defendant's pharmacy records on April 18, 1988. Levine first went to defendant's pharmacy on April 4, 1988, but was told he was out of town. When Levine returned April 18 during normal business hours, he spoke to defendant, identified himself, and asked to see the pharmacy invoices. Defendant did not object.[10]

Following a pretrial hearing, the court denied defendant's motion to suppress the results of Inspector Levine's audit, finding defendant lacked a reasonable expectation of privacy in the pharmacy records. The court specifically noted that the audit was conducted pursuant to Business and Professions Code sections 4231 and 4232, which expressly authorize warrantless inspections of highly regulated businesses.

The court's denial of the motion to suppress was correct. ■ It is well settled that warrantless searches of pervasively regulated and licensed businesses are permissible under the Fourth Amendment, if conducted pursuant to statutory authorization. (See *New York* v. *Burger* (1987) 482 U.S. 691, 702-707 [96 L.Ed.2d 601, 613-617, 107 S.Ct. 2636]; see also *People* v. *Firstenberg* (1979) 92 Cal.App.3d 570, 579-581 [155 Cal.Rptr. 80] [skilled nursing home operator's acceptance of license carries with it burden of submitting to inspections which reasonably further enforcement of regulatory scheme]; *Miller* v. *Obledo* (1978) 79 Cal.App.3d 714 [145 Cal.Rptr. 140] [licensing system may lawfully require optometrist to submit to reasonable inspection without warrant, subpoena, or express consent]; *United States* ex rel. *Terraciano* v. *Montanye* (2d Cir. 1974) 493 F.2d 682 [state statute could validly authorize warrantless inspection of pharmacy records].) The potential for discovery of criminal activity does not invalidate an otherwise lawful search. (*New York* v. *Burger, supra*, 482 U.S. at p. 717 [96 L.Ed.2d at p. 623].)

[9] Defendant's reliance on *People* v. *Bush* (1978) 84 Cal.App.3d 294 [148 Cal.Rptr. 430], is misplaced. There, the trial court's judgment of acquittal on first and second degree murder charges effectively eliminated motive as an issue. Here, in contrast, the existence of a street market for the drugs in question, known to defendant, was relevant to show intent.

[10] At the pretrial hearing on defendant's motion to suppress, he testified that as a pharmacist, he believed he was required by law to make his records available for inspection during normal business hours.

 It is undisputed that pharmacies are closely regulated businesses in California. It is equally clear that state statutes authorize administrative inspections of pharmacies. Business and Professions Code section 4231 provides that "[a]ll stock of any dangerous drug or device of a . . . pharmacy . . . shall be at all times during business hours open to inspection by authorized officers of the law." Section 4232 further provides that "[a]ll records of manufacture and of sale, purchase or disposition of dangerous drugs or devices shall be at all times, during business hours, open to inspection by authorized officers of the law, . . ." Defendant's argument that these sections are subject to the warrant requirement of Code of Civil Procedure sections 1822.50 through 1822.56 ignores the language of those sections limiting their applicability to inspections "relating to building, fire, safety, plumbing, electrical, health, labor, or zoning." Those sections do not apply to statutorily authorized warrantless administrative inspections of pervasively regulated businesses. (*People* v. *Firstenberg* (1979) 92 Cal.App.3d 570, 583 [155 Cal.Rptr. 80].)

 Under both the statutory scheme and the circumstances of this case, defendant had no reasonable expectation of privacy in the pharmacy records. He was an experienced pharmacist, and his premises had been expected at least twice before. Within the past year he had been the subject of an inquiry by the State Board of Pharmacy concerning a consumer complaint and had been visited by a Pharmacy Board inspector. He was well aware of the existence of recordkeeping requirements and had maintained records from previous years. Given the pervasive regulation of the pharmaceutical industry and defendant's particular familiarity with it, there can be no legitimate claim that he maintained any expectation of privacy in the pharmacy records.

Because we find no error in the submission of the case to the jury, the sufficiency of the evidence to support the convictions, the admission of the expert's testimony, or the trial court's denial of the motion to suppress, we need not address defendant's claim that cumulatively the errors below warrant a new trial.

The judgment is affirmed.

Gates, Acting P. J., and Fukuto, J., concurred.

A petition for a rehearing was denied April 21, 1992, and appellant's petition for review by the Supreme Court was denied June 24, 1992.